# EXHIBIT 1

Page 5 of Transcript of September 17, 2020 proceeding conducted by Honorable Ashley M. Chan United States Bankruptcy Judge.

See the following statement of Judge Chan on lines 24-25:

"The Court: Okay. Well let me hear from the other side. Jamie, did you have a response to this request?"

Page 5

1    real need for it.  Can you tell me why you need so much time

2    to respond to the motion for summary judgment?  I mean,

3    typically, you'd get a couple of weeks, and I was willing to

4    give you a month and that, you know, obviously some time has

5    passed since that was even filed.

6              So why do you feel that you need all this extra

7    time?

8              MR. SMOLKER:  Well, it's 755 pages long, and there

9    are very strong arguments for not granting the summary

10   judgment motion, and I would like to be able to present my

11   arguments in the best possible way; that would be clear 120

12   days, but I could present all my arguments in 90 days.

13             I don't want to talk about the merits of my

14   opposition.

15             THE COURT:  No, I don't want you to either.  I

16   don't want you to either.  I just want to try and

17   understand, you know --

18             MR. SMOLKER:  And also, I'm on a medical

19   disability.  I have a breathing problem and I'm consulting a

20   pulmonologist and I'm in the middle of taking various tests

21   and to go to a cardiologist and take more tests.  I have

22   injured lungs and difficulty breathing, so I'm somewhat

23   disabled in my stamina and ability to focus and concentrate.

24             THE COURT:  Okay.  Well, let me hear from the

25   other side.  Jamie, did you have a response to this request?

# EXHIBIT 2

Appendix of Exhibit List filed by W.R. Grace & Co. on July 20, 2021. This document was filed on July 20, 2021 in Appeal Case No. 1:21-cv-0987-LPS as Document Number 5.

## APPENDIX EXHIBIT LIST

These exhibits are referred to in the Motion to Enforce as the "Other Court Docket Items."

1.  Bankruptcy Court Docket, January 1, 2021 – July 8, 2021, *In re W. R. Grace & Co., et. al.*, Case no. 01-1139-AMC (Bankr. D. Del.) (the "Bankruptcy Court Docket").

2.  *Request for Hearing Date for Motion Seeking a Court Order*, filed March 15, 2021 [Docket no. 33215] (the "Sanctions Hearing Request").

3.  *Notice of Hearing*, entered March 16, 2021 [Docket No. 929630] (the "March 16 Notice").

4.  Reorganized Debtor's *Certificate of Service*, filed March 16, 2021 [Docket No. 929632],

5.  BNC *Certificate of Service*, filed March 18, 2021 [Docket No. 33221].

6.  *Request to Cancel June 24, 2021 Hearing*, filed June 4, 2021 [Docket No. 33231] (the "Request to Cancel Hearing").

7.  *Response to Appellee's Request to Cancel Hearing*, filed June 21, 2021 [Docket No. 33232] (the "Response").

8.  *Objection to Appellee's Request to Cancel Hearing*, filed June 21, 2021 [Docket No. 33233] (the "Objection").

9.  *Reply to Mr. Smolker's Response*, filed June 21, 2021 [Docket No. 33234] (the "Reply").

10. *Agenda for the June 24, 2021 Hearing*, filed June 22, 2021 [Docket No. 33235].

11. *Order*, entered June 22, 2021 [Docket No. 33236] (the "June 22 Order").

12. *Amended Agenda Cancelling June 24, 2021 Hearing*, filed June 22, 2021 [Docket No. 33237].

13. September 17, 2020 Hearing Transcript [Docket No. 33190].

14. *Notice of Appeal*, filed July 2, 2021 [Docket No. 33239].

15. *Designation of Record*, filed July 16, 2021 [Docket no. 33246].

# EXHIBIT 3

Chart reporting a list of documents that should have been provided by GRACE but were not provided to Chief U.S. Magistrate Judge Mary Pat Thynge and to United States District Court Judge Stark.

## APPENDIX EXHIBIT LIST

| EXHIBTS | TITLE | AMOUNT OF PAGES |
|---|---|---|
| Exhibit 1 | Bankruptcy Court Docket | 13 pages |
| Exhibit 2 | *Request for Hearing Date for Motion Seeking a Court Order* | 8 pages |
| Exhibit 3 | *Notice of Hearing* | 3 pages |
| Exhibit 4 | Reorganzied Debtor's *Certificate of Service* | 4 pages |
| Exhibit 5 | BNC *Certificate of Service* | 3 pages |
| Exhibit 6 | *Request to Cancel June 24, 2021 Hearing* | 23 pages |
| Exhibit 7 | *Response to Appellee's Request to Cancel Hearing* | 154 pages |
| Exhibit 8 | *Objection of Apellee's Request to Cancel Hearing* | 21 pages |
| Exhibit 9 | *Reply to Mr. Smolker's Response* | 35 pages |
| Exhibit 10 | *Agenda for June 24, 2021 Hearing* | 8 pages |
| Exhibit 11 | *Order* | 5 pages |
| Exhibit 12 | *Amended Agenda Cancelling June 24, 2021 Hearing* | 13 pages |
| Exhibit 13 | September 17, 2020 Hearing Transcript | 33 pages |
| Exhibit 14 | *Notice of Appeal* | 10 pages |
| Exhibit 15 | *Designation of Record* | 20 pages |
| | **TOTAL PAGES:** | **353 pages** |

# EXHIBIT 4

Photo of Appendix Exhibits on scale being weighed. A total of 353 pages of exhibits were not provided by GRACE to either Chief Magistrate Judge Thynge or to United States District Court Judge Stark. On a scale they weighed 3 pounds, 12.2 ounces with post-its attached to particular pages.



APPROV___

to the Motion to Enforce as the "Other Cou___

January 1, 2021 – July 8, 2021, In re W. R. Grace & Co., et. al.,
(M__ Bankr. D. Del.) (the "Bankruptcy Court Docket").

Doc___

t___ for Motion Seeking a Court Order, filed March 15, 2021 [Docket

th___ is Hearing Request").

d March 16, 2021 [Docket No. 929630] (the "March 16 Notice").

Certificate of Service, filed March 16, 2021 [Docket No. 929632],

dat___

date, filed March 18, 2021 [Docket No. 33221].

orde___, filed June 4, 2021 [Docket No. 33231] (the

ce__ June 24, 2021 Hearing, filed June 4, 2021 [Docket No. 33231] (the
N__ Hearing")

pel___ s Request to Cancel Hearing, filed June 21, 2021 [Docket No.

Ap___ Request to Cancel Hearing, filed June 21, 2021 [Docket No.

S___ or's Response to Request to Cancel Hearing, filed June 21, 2021 [Docket No.

J__ 24, 2021 Hearing, filed June 22, 2021 [Docket No. 332334] (the "Reply").

C__ Cancellation, June 24, 2021 [Docket No. 33235].

J__ 24, 2021 Hearing, filed June 22, 2021 (the "June 22 Order").

 J__ Hearing, filed June 22, 2021 [Docket No.

ng Hearing Transcript [Docket No. 33190].

[Docket No. 33259].

Filed July 2, 2021 [Docket No. 33239].

Record, filed July 16, 2021 [Docket no. 33246].



# Exhibit 5:

List of attorneys represented by GRACE in Appeal Case No. 1-21-cv-00987-LPS given to SMOLKER by Chief U.S. Magistrate Judge Thynge's Judicial Law Clerk Daniel Taylor.

'M/ECF LIVE - U.S. District Court:ded

# CM   ECF
Civil    Criminal    Query    Reports    Utilities    Search    Help

What's New    Log Out (Daniel Taylor)

PRO-SE

# U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00987-LPS
### Internal Use Only

In Re: W.R. Grace & Co., et al.                     Date Filed: 07/02/2021
Assigned to: Judge Leonard P. Stark                 Jury Demand: None
Case in other court: USBK/DE, 01-01139-AMC          Nature of Suit: 422 Bankruptcy Appeal (801)
     USBK/DE BAP No., 21-00049            Jurisdiction: Federal Question
Cause: 28:0158 Bankruptcy Appeal from Judgment/Order

**Debtor**

**W.R. Grace & Co., et al.**

**Appellant**

**Gary Smolker**                    represented by   **Gary Smolker**
                   16055 Ventura Blvd
                   Suite 525
                   Encino, CA 91436
                   PRO SE

V.

**Appellee**

**W.R. Grace & Co., et al.**                   represented by   **Mark M. Billion**
                   Billion Law
                   922 New Road
                   Wilmington, DE 19805
                   302-428-9400
                   Email: markbillion@billionlaw.com
                   *LEAD ATTORNEY*
                   *ATTORNEY TO BE NOTICED*

                   **Curtis A. Hehn**
                   Law Office of Curtis A. Hehn
                   1000 N. West Street
                   Suite 1200
                   Wilmington, DE 19801
                   (302) 295-5044
                   Email: curtishehn@comcast.net
                   *ATTORNEY TO BE NOTICED*

                   **Daniel K. Hogan**
                   Hogan McDaniel

1311 Delaware Avenue
Wilmington, DE 19806
(302) 656-7540
Fax: (302) 656-7599
Email: dkhogan@dkhogan.com
*ATTORNEY TO BE NOTICED*

# Exhibit 6:

Returned mail sent to Lead Attorney for GRACE, Mark M. Billion, Esq.



FROM
A/V/K
SMOLKER LAW FIRM
SUITE 535
16055 VENTURA BOULEVARD
ENCINO, CALIFORNIA 91436-2609

TO

Mark M. Billion Esq.
Billion Law
922 New Road
Wilmington DE 19805

RECEIVED
AUG 0 5 2021
BY:

First Class Mail

# Exhibit 7:

Judicial Profile of Hon. Mary Pat Thyne Chief U.S. Magistrate Judge, District of Delaware, written by Hon. Leonard P. Stark and Anne Shea Gaza, published May/ June 2014.

Published May/June 2014



## Judicial Profile

by Hon. Leonard P. Stark and Anne Shea Gaza

# Hon. Mary Pat Thynge
# Chief U.S. Magistrate Judge, District of Delaware

As the longest serving U.S. Magistrate Judge in the history of the District of Delaware, Chief Magistrate Judge Mary Pat Thynge is universally admired for her enormous intellect, practical problem-solving skills, unsurpassed commitment to preparation and hard work, and legendary tenaciousness. Twenty years ago, Judge Thynge established Delaware's highly successful program for alternative dispute resolution (ADR), which has earned her a national reputation for seeming to perform miracles in settling complex commercial and intellectual property cases. One key to her success as a mediator is Judge Thynge's extensive experience as a judicial officer handling all types of cases, giving her solid ground from which to speak candidly to counsel—and their clients—about the merits of a case. Despite the challenges of a heavy docket, Judge Thynge somehow manages to always maintain a calm demeanor and healthy sense of humor.



In the words of Third Circuit Judge Kent A. Jordan, who worked closely with Judge Thynge when he was a District Judge, "It's not just her prodigious work ethic, which on its own is extraordinary. It's a whole combination of qualities that make her a truly great judge. She appreciates lawyers and the challenges they face but demands the best from them and gives the best of herself, so her example sets a high standard and leads all of the participants in a case to perform that much better." Or as her mentor, Victor Battaglia, puts it, Judge Thynge is "95 pounds of the toughest human being ever encountered. A hard-working, don't give me any crap scholar, she is an example of what a judge can do, not by doing anything controversial, but by doing hard work, doing her homework, and learning the case as well as (if not better than) any of the lawyers—coupled with the respect of the bar."

A Delaware native, Judge Thynge learned from the time she was a child that excellence is the result of hard work and always doing your best on whatever path you choose. Her father, Robert (Bob) Albert, was a biochemist with DuPont, and her mother, Loretta (Grane) Albert, was a dietician. It is fitting that the parents of a future judge who has so ably handled so many technical cases met in chemistry class—at Kent State University, when Bob kept trying to get Loretta's attention by asking her for a piece of equipment.

Though grounded in the sciences, both of Judge Thynge's parents also had a deep appreciation for the law, which they passed along to their only child. Her father even considered pursuing a law degree after he had earned his doctorate in chemical engineering, but Loretta told him he had already attended enough school. Loretta's father, Patrick Grane, was a lawyer, and young Judge Thynge spent

*Hon. Leonard P. Stark is a former U.S. Magistrate Judge in the District of Delaware, a position he held until his confirmation in 2010 as a U.S. District Judge for the District of Delaware. Anne Shea Gaza is a partner at Young, Conaway Stargatt & Taylor LLP in Wilmington, Del., where her practice focuses on intellectual property litigation and complex commercial litigation in Delaware's state and federal courts. The authors thank Judge Thynge for the time she has devoted to this project as well as all of the many individuals who have provided comments and other materials that have made this profile possible. The views expressed in this article are those of the authors and do not necessarily represent the views of their colleagues, their firm, their clients, or the District of Delaware.*




hours at his office, often reading documents to him when he became legally blind due to diabetes. Grandfather Grane, who even ran for judicial office in Ohio despite his blindness, modeled for Judge Thynge how perseverance and determination may allow a person to overcome medical challenges.

Cousin Rick Grane recalled that Judge Thynge "was way above us ... brainwise," but quickly added that she was "not snooty" and never smug. As a particularly strong math and science student, Judge Thynge had, by the age of 12, narrowed her career ambitions to becoming a chemical engineer, an archaeologist (although now she laughs as she can't remember why this job seemed desirable), or a lawyer. After attending Holy Angels School and Ursuline Academy, she graduated from Brandywine High School in Wilmington, Del., and enrolled at Miami University in Oxford, Ohio. While none of us who know her now can believe there was a time she was (as she insists) "not a morning person," it was in college that Judge Thynge became the "morning, all through the day, and all through the night person" she is today. At Miami, her days would begin at 5:30 a.m., working the breakfast shift in the dining hall, after which she would attend classes through the afternoon, followed by tending bar in a local restaurant, even though she was too young to drink the alcohol she served. In a turbulent time, marked by the Vietnam War and the shooting of unarmed students by the Ohio National Guard at Kent State (her parents' *alma mater*), Judge Thynge graduated in just three years, earning a degree in secondary education.

**As a student at Miami University, her days would begin at 5:30 a.m., working the breakfast shift in the dining hall, after which she would attend classes through the afternoon, followed by tending bar in a local restaurant, even though she was too young to drink the alcohol she served.**

Judge Thynge was uninterested in teaching high school, so barely two weeks after college graduation she began classes at Ohio Northern University Law School, in Ada, Ohio, which she describes at the time as being a small town "in the middle of nowhere" with one traffic light, a solo pizza parlor, and a single grocery store. She recalls that her 1L year involved a steady diet of cheap tacos and unending rain. Perhaps unsurprisingly, she told her father she was seriously considering not returning for her second year and instead going to pursue archaeology. Thankfully, her father—assisted by her cousins, Karen and Rick Grane, as well as some of her classmates—persuaded her to continue in law school, where she thrived. Among other distinctions, Judge Thynge served as associate manuscript editor for the law review, became a member of moot court and the student division of the American Bar Association, and performed research for two law professors.

Barely 24 years old, the young lawyer returned to Delaware, eager to practice. Unfortunately, in 1976, it seemed that most law firms were not interested in hiring someone who was just the 30th woman to be admitted to the Delaware bar.[1] She felt fortunate to be given an opportunity by Victor Battaglia, who had recently opened Biggs & Battaglia, where, he remembers, smiling, she provided

"everything that I needed to start the office. She would do 95 percent of the work and I would get 95 percent of the credit."

Battaglia observed that Judge Thynge "took to medical malpractice like a duck to water." Ironically, an article Judge Thynge wrote in law school arguing against the use of hospital immunity helped land her the job defending hospitals and doctors. "Clients fell in love with Mary Pat, as I did," Battaglia recalls, so it wasn't long before doctors were calling the firm specifically to ask for her to take their case. Even then, Judge Thynge "had a talent for settling cases," and she quickly developed a reputation for telling clients honestly about the value of their case.

Impressed with Judge Thynge's determination and desire to be in court right away, Battaglia tried cases with her in the Delaware Superior Court and soon turned her loose to try cases with even less experienced attorneys. One of them was Pamela Tikellis, who credits Judge Thynge for teaching her how to be a trial lawyer, how to handle difficult clients, and how to adapt to challenging situations. Tikellis fondly recalls Judge Thynge's motto: "It is not a question of if you are going to do it. You are going to do it because it has to be done." After trying many cases together, Thynge and Tikellis became like sisters, and Tikellis' mother eventually hired Judge Thynge to represent her in a replevin action against a former daughter-in-law. Ably navigating the legal issues as well as the family dynamics, Judge Thynge persuaded the court to order the return of family heirlooms, including a tablecloth that Tikellis' mother continues to use to this day. Throughout their working relationship, Tikellis was awed by Judge Thynge's "dogged determination, tenacity, and good heart."

During her tenure at Biggs & Battaglia, and later as managing attorney of the Delaware office of White and Williams, where she continued to handle medical malpractice cases as well as asbestos and other toxic tort cases, Judge Thynge held multiple positions with the Delaware State Bar Association (DSBA). In 1992, she was poised to become president, making her only the second female attorney to hold this position. Instead, when the Hon. Sue L. Robinson was elevated to a district judgeship, Judge Thynge was appointed to fill the resulting Magistrate Judge vacancy.[2]

At her investiture ceremony in June 1992, Judge Thynge's friend and former colleague, Anne Naczi, predicted she would be a "fantabulous" judge. It was a sentiment echoed by then-Chief Judge Joseph Longobardi, who said, "We know your presence here will be marked with honor and distinction." Linda Hanick, who had been her paralegal and remains her close friend, describes the ceremony as "awe-inspiring in its solemnity, its quiet grace, and the heartfelt comments shared." For Victor Battaglia, to whom Judge Thynge had by then become the "daughter he never had," it was "like it was one of your kids being successful."

Hitting the ground running, Judge Thynge threw herself into her new role, especially areas that were unfamiliar to her, like criminal law. Then, in 1994, she held her first mediation. Appropriately, it was in a patent case, and it settled. Unlike the approach taken by many other judges and private mediators, Judge Thynge generally does not conduct mere settlement conferences, which might last at most two hours and involve

only a few, quick rounds of offers and counteroffers. Instead, Judge Thynge introduced in Delaware lengthy mediations, which usually last at least a day and often run into the night or even the wee hours of the morning. When a case doesn't settle at the first mediation, often Judge Thynge will schedule a second or even a third. And leaving the courthouse does not mean that lawyers and their clients are free of Judge Thynge. To the contrary, it is common for her to send e-mails or call counsel—including on nights, weekends, and holidays. This extraordinary persistence, all agree, contributes directly to her success in resolving cases, which in turn helps alleviate some of the burden of the docket in the District of Delaware, which has now become the heaviest docket of any district court (as measured by the Administrative Office (AO) of the U.S. Courts' weighted case average).[3] A 2006 AO report, which surveyed the District of Delaware's utilization of Magistrate Judges, found that Judge Thynge "has developed a highly respected expertise in mediation and other forms of ADR, particularly in intellectual property areas," and further remarked that she "works extremely long hours."[4]

Judge Thynge has now handled more than 2,000 mediations and settled more than 80 percent, often at the first mediation. Of that total, well over 900 involved patent matters, of which she estimates she has settled 75 percent, most after a single in-person mediation and many others after multiple mediations and extensive personal follow-up. This is a truly astounding result, particularly given the complexity of the factual and legal issues, and high dollar figures, that are typically involved.

Adam Mortara, a partner with Bartlit·Beck Herman Palenchar & Scott LLP, has watched as Judge Thynge demonstrated her affinity for helping parties find appropriate business resolutions to their disputes. He described how she resolved a time-sensitive intellectual property case that was referred to Judge Thynge for all purposes, including handling a preliminary injunction motion and ADR. Near the start of a lengthy preliminary injunction hearing, Mortara thought he had "died and gone to judicial heaven" when he said the case involved a "Jepson claim" and Judge Thynge nodded, telling Mortara she knew what that was. After Judge Thynge wrote a lengthy report and recommendation (later adopted by Judge Stark), she turned her focus to mediating the case, ultimately helping achieve a settlement. In that mediation, like others he has experienced, Judge Thynge got the parties "to focus on the business dispute," employing "brutal honesty" mixed with the gravitas earned through years of presiding over cases as a judicial officer.

Tim Haller, a partner with Niro, Haller & Niro, similarly described Judge Thynge as "a master at what she does," adding that her "persistence leads to direct resolution of the case. She does her homework and knows what it takes to make a business deal, even though it sometimes falls outside the legal realm." Haller says that "she is so good at ADR, if there were 100 more of her sprinkled across the courts across the country," the federal judicial docket would not be nearly as overwhelming.

Judge Thynge's reputation as a mediator is reflected in the many invitations she receives to write and speak about



Flanked by her cousins, Rick Grane and Jeff Treuheit, Judge Thynge is surrounded by two of her favorite court jesters.

ADR. These inquiries are initially fielded by her judicial administrator, Cathie Kennedy, who has known Judge Thynge for more than 30 years, dating back to their days together at Biggs & Battaglia. Kennedy often receives calls from attorneys around the country inquiring into whether Judge Thynge could mediate their case—even though their case is not even in federal court nor in the District of Delaware. Frequently, parties that have worked with Judge Thynge to reach a settlement will make it a condition of their settlement agreement that all future disputes must be referred to her. Jim Amend, who served as the chief mediator for the Court of Appeals for the Federal Circuit, noted that in every case he mediated at the appellate level that had initially been mediated by Judge Thynge at the trial court level, the attorneys were highly complimentary and had the utmost respect for her. Recently, at Chief Judge Randall Rader's request, Judge Thynge has agreed to serve as a volunteer mediator for the Federal Circuit.

When asked to talk about some of the thousands of mediations she has done, Judge Thynge focuses on two, which she says remind her of the beauty, strength, and resiliency of the human spirit. One case involved an automobile accident that resulted in the plaintiff's leg being amputated below the knee. When she asked the plaintiff what she could do to ease his grief, he responded that he just wanted his leg back. Judge Thynge explained she wished she had a magic wand and could make that happen but, instead, she could only help him get some compensation so he could move on with his life. At the successful conclusion of the mediation, the plaintiff asked, "Am I allowed to hug the mediator?" to which she replied, "Yes!" The other case she recollected involved five people suffering horrific electrical burns, causing the death of two of them and great suffering and injury among the others and their families. After an arduous mediation, the multimillion dollar settlement helped, in some measure, to bring closure to the parties, so they could try to leave behind a tragic chapter in their lives.

It is this ceaseless dedication to assisting parties, coupled with an unending compassion to help guide them to the

best resolutions possible, that garners the respect and admiration of her colleagues. Her friend and colleague on the bench, Chief Judge Gregory M. Sleet, recognizes that it is "her indefatigable approach to helping lawyers and their clients resolve their disputes—from the simplest to the most complex—that makes her commitment to her work, quite simply, unsurpassed." Describing her as a person of great compassion, he remembers fondly the many conversations they have had over the years about various issues confronting society. Indeed, it is with gratitude and amazement that he recalls "how uplifting it has been each and every time she has looked me in the eye, touched my arm, and said, 'Greg, are you ok?'" In the words of Chief Judge Sleet, those qualities and more make Judge Thynge "quite simply the best colleague and friend one could hope to have."

Judge Thynge's skills in mediation have led many practitioners to note that the District of Delaware's ADR program is one of the reasons so many cases, particularly patent cases, are filed there. Her national reputation is reflected, for instance, in the website "The Robing Room," which consistently ranks her among the top 10 federal judges in the country (and often as number one). Comments posted on that website include: "She is even-handed, fair, and EXTREMELY well prepared," "This is the best judge in the federal judiciary," and "She is the most down-to-earth, sensible magistrate judge before whom I have appeared. The system should clone her."[5]

Until 2007, Judge Thynge was the sole Magistrate Judge in the District of Delaware, so she formed tight relationships with Magistrate Judge colleagues in other districts. She fondly remembers being "adopted" by the District of New Jersey. John Hughes, a former Magistrate Judge in that district, spent time with Judge Thynge at conferences and seminars and saw how she had "a lot of passion for the job" and was "one of the first Magistrate Judges to get involved in full out mediation." Ronald Hedges, another former Magistrate Judge in New Jersey, described Judge Thynge as a really fun person who is always "looking forward to getting into new areas." Judge Hughes and Judge Hedges sought Judge Thynge's advice when the District of New Jersey was devising its ADR program and learned from her that, as Hughes put it, "no one size fits all—each case has different needs, and you really need to dig in and figure out what the case is about and allot enough time to allow the case to work itself out."

Despite having 300 to 400 active mediation cases at any given time—and frequently conducting three or more full-day mediations each week—Judge Thynge also fully devotes herself to her work as a judicial officer, covering one-third of the District of Delaware's initial criminal proceedings and duty matters, presiding over cases and select motions to which parties have consented to her jurisdiction, and handling dozens of cases on referral from the District Judges. She has authored hundreds of opinions and reports and recommendation and presided over numerous trials. She regularly performs naturalization ceremonies and weddings, duties she especially enjoys.

Additionally, Judge Thynge devotes countless hours to the development of law students and young attorneys,

including the many externs she has employed in her chambers. Her career law clerk, Robert Anderson, who has worked with Judge Thynge for more than a decade, notes that she often involves externs in mediations and lets them participate meaningfully in the process. She somehow also finds time to be active within the Federal Magistrate Judges Association, including serving as executive editor of its *Federal Courts Law Review*. In her spare time, Judge Thynge's ideas of fun include gardening, digging trenches in her backyard, picking strawberries and blueberries to make jam, helping her husband, Larry, put a new roof on their house, and every Christmas making Amish friendship bread and sweet rolls for her chambers family and others at the courthouse.

Her family, among whom she counts her court family, also helps to temper the gravity of her work with pranks. Surrounded her whole life by people who clearly prize the ability to "take a joke," as her cousin Jackie Treuheit once explained, Judge Thynge scores high on this scale as well. Several years ago, her cousins Rick Grane and Jeff Treuheit surprised Judge Thynge by coming to court dressed in clown costumes. They described the look on her face as priceless and knew she very much appreciated the humor. Her longtime courtroom deputy, Keith Kincaid, who has worked for Judge Thynge for 17 years, has similarly surprised her, including when he interspersed papers for criminal proceedings with copies of pictures from her high school yearbook and handed them to her while she was on the bench. As always, Judge Thynge took it all in stride.

Judge Thynge has proven herself to be something of a prankster as well. In private practice, she surprised Victor Battaglia by arranging for a belly dancer to perform for him at the office on his 50th birthday. As a judge, she filled a law clerk's car with balloons and then relocated the car from its original parking spot. Judge Thynge once learned that an associate appearing before her in trial was celebrating his birthday—a fact not known to his own trial team—and required everyone to sing "happy birthday" to him. On her own 60th birthday, cousins Rick and Jeff sent her a gaudily decorated walker. Later, Judge Thynge gleefully regifted the infamous walker to Judge Sue L. Robinson upon her 60th birthday, adding more decorations and possibly initiating a new Delaware tradition. Most recently, Rick and Jeff decorated Judge Thynge's home in Florida with walkers and bedpans; they now patiently await her inevitable revenge.

Fortunately for all of us who work in the District of Delaware, Judge Thynge has no plans to stop, even after 22 years and nearly three full terms as a Magistrate Judge. She says she "truly enjoys what she does" and continues to find being a Magistrate Judge "a rewarding, satisfying experience." In the words of Judge Jordan, "There is not a finer judge anywhere, and we are very, very lucky to have her here with us." Indeed we are! ☉

### Endnotes

[1]With a career spanning almost 40 years, Judge Thynge still recalls when the number of female litigators in Delaware could be counted on two hands. Then she was often

mistaken for the court reporter in depositions and, during her first hearing, was even instructed by the judge that she needed to have an attorney speak on her behalf. A trailblazer and advocate for the advancement of women in the law, since her early days in practice she has been involved with the Delaware State Bar Association's Women and the Law Section, the Wilmington Women in Business, and the National Association of Women Judges. She is a recipient of an Outstanding Young Women of America award, the Girls Incorporated of Delaware award, and recognition by *Who's Who in American Women*.

[2]Despite passing up its presidency, in 2012 the DSBA recognized Judge Thynge by naming her the recipient of its prestigious Outstanding Service to the Courts and Bar Award, which is presented to a lawyer or judge who "by exemplary service to the Delaware Courts and the Delaware Bar has substantially assisted the Courts and the Bar and strengthened the public trust and confidence in the State's court system and the administration of justice."

[3]*See* www.uscourts.gov/uscourts/Statistics/Judicial Business/2012/appendices/X01ASep12.pdf (last accessed on Jan. 31, 2014).

[4]Administrative Office of the U.S. Courts, *Magistrate Judge Survey: District of Delaware,* at pp. 10-11, unpublished manuscript (June 2006); *see also* Mary Pat Thynge and Leonard P. Stark, *Delaware's Magistrate Judges* in *History of the Delaware Bar from 1995 through 2010* (2010). Judge Stark observes that he has rarely been in the federal courthouse when Judge Thynge has not also been there. No matter the time of day, morning or night, weekday, weekend, or holiday, he almost never fails to see Judge Thynge's car in the judges' garage.

[5]*See* www.therobingroom.com (last accessed on Jan. 31, 2014).

# Exhibit 8:

Blood Pressure Readings. August 9, 2021 and August 12, 2021.

GARY SMOLKER

Blood Pressure Readings Left Arm

August 9, 2021 at 7:10 A.M.

BP 187/94 p 68

BP 193/105 p 69

BP 183/106 p 71

August 12, 2021 at 7:52 A.M.

BP 178/94 p 72

BP 162/92 p 73

BP 152/94 p 75

BP 153/94 p 73

# Exhibit 9:

Weight August 27 - September 7, 2021

| 7:00 | Aug 27 | 168.6 |
|------|--------|-------|
| 7:05 | Aug 28 | 170.2 |
| 7:20 | Aug 28 | 169.6 |
| 9:00 | Aug 29 | 168.8 |
| 7:21 | Aug. 30 | 170.4 |
| 9:00 | Sept 1 | 170.0 |
| 9:13 | Sept 2 | 171.6 |
| 6:55 | Sept 3 | 170,2 |
| 9:24 | Sept 4 | 169,0 |
| 7:30 | Sept 5 | 170,4 |
| 7:56 | Sept 5 | 120,8 |
| 7:14 | Sept 6 | 172 |
| 8:13 | Sept 6 | 171.8 |
|      | Sept 7 | 171,2 |

# Exhibit 14:

Photos of books ("Standard California Codes" and "Rules of Court") in bookcase in home library, toothpaste and deodorant in home bathroom, taken from rented condo in Van Nuys to hotel room in Woodland Hills on September 10, 2021.









# Exhibit 15:

Two photographs of master bedroom in rented condo with dimension of object photographed superimposed.

   (1)  Master Bedroom (224" x 239")

   (2) Bed in Master Bedroom (90" x 94" x 90")



Master Bedroom

224" x 239"



90"x94"x90"